## S12A0976. TOOMER v. THE STATE.
### (734 SE2d 333)

NAHMIAS, Justice.

Appellant Kasaem Toomer challenges his 2009 convictions for malice murder and other crimes in connection with the death of Justin Cox. We affirm.[1]

---

[1] The crimes occurred in the late night hours of October 3, 2007, and during later interviews with police. On December 19, 2007, Appellant and Robert Lee Williams were indicted in Dougherty County for malice murder, theft by taking, and giving false statements. Appellant was also charged with felony murder based on aggravated assault, aggravated

1. The evidence at trial, viewed in the light most favorable to the verdict, showed the following. Shortly after 10:00 p.m. on October 3, 2007, 19-year-old Justin Cox left in his car from his home in Albany, Georgia, where he lived with his parents. His parents became alarmed the next day when they realized that he had not come home the night before and discovered that he had failed to show up for work that morning. They contacted the police, who had already been alerted to a dead body found floating in the Flint River; it was the victim. The police found the victim's car in the Civic Center parking lot. The medical examiner testified that a quarter-sized, oval-shaped skull fracture with jagged edges on the left side of the victim's head was consistent with a forceful punch by someone wearing a ring like the one the police seized from Appellant. The large, heavy ring was described as similar to a brass knuckle. The cause of death was reported as blunt force trauma to the head and drowning.

The victim's phone records showed 33 calls between the victim and Appellant's cell phone in the two days before his death, leading the police to interview Appellant. The police spoke with him on October 11, 12, 15, and 17, 2007; he waived his *Miranda* rights in writing on each occasion. Video recordings of the first three interviews were admitted into evidence, along with statements Appellant handwrote on October 11 and 17.

In the October 11 interview and written statement, Appellant, after being shown a picture of the victim, denied ever having seen or heard of him until he saw a story about the victim's death on the news. When confronted with the cell phone records, Appellant tried to cast suspicion on a man named "Kentrell," whose last name he said he did not know. Appellant claimed that he let Kentrell borrow his cell phone for several hours on the night the victim was killed.

In the October 12 interview, Appellant claimed that he lent his cell phone to a different person that night — Kentea Jones, who had long been wanted for questioning by the Albany Police Department in

assault, and first degree arson (for setting a fire in a police station interview room), and Williams was also charged with concealing the death of another. Appellant pled guilty to the arson charge before trial, and on May 11-14, 2009, Appellant was tried separately from Williams and convicted of the remaining charges against him. Appellant's felony murder conviction was vacated by operation of law, and his aggravated assault conviction merged into his malice murder conviction. The trial court sentenced Appellant to time served for making false statements, life in prison for malice murder, and a total of eight years consecutive for theft by taking and first degree arson. On June 12, 2009, Appellant filed a motion for new trial, which he amended three times in July 2011. The trial court held an evidentiary hearing on July 21, 2011, and denied the motion on January 6, 2012. Appellant timely appealed, and the case was docketed in this Court for the April 2012 term and submitted for decision on the briefs.

connection with other crimes and was believed to be living some-where in Florida. Appellant claimed that Jones said that he and an accomplice had attempted to rob a white man and beat him to death because he did not have any money. Appellant again denied knowing the victim, but then he said that he was with Jones when Jones got into the victim's car on the night he was killed and that the victim had given him a ride a week earlier during which the victim propositioned Appellant for sex. Appellant insisted that he had told the police everything he knew about the incident and denied that he lied on October 11.

At that point, the officer questioning Appellant told him that she knew he was lying, said that he was under arrest for murder and making false statements, and left Appellant alone in the interview room. Appellant took a small bottle of cologne from his jacket pocket and drank it, lit his jacket on fire, and blocked the door. The police were able to enter the room a few minutes later and extinguished the small fire, which had damaged the floor. Appellant was placed in restraints, read his *Miranda* rights again, checked by medical personnel, and then transferred to jail. Before being transferred, Appellant admitted that he originally said something that was not true because he was shaken up but maintained that everything else he had told the police was the truth. Within days, the police confirmed with people who knew Jones that he had not been back to the Albany area for several months.

In the October 15 interview, Appellant continued for the first two hours to deny any involvement in the victim's death, but then he changed his story. Appellant said that he had known the victim for two months before he died and that he was riding around with the victim and Robert Lee Williams in the victim's car on the night he was killed. Appellant said that the men drove to the boat dock, where Appellant got into an argument with the victim and punched him in the head, knocking him out. Appellant claimed that he checked to see if the victim was breathing, decided that he was not, and then threw the victim's body in the river with Williams's assistance. Appellant said that he and Williams then fled the scene in the victim's car and that Williams told him the next day that he left the car at the Civic Center.

On October 17, Appellant was brought from the jail to the police station at his family's request. Appellant signed a waiver of his *Miranda* rights but declined to answer any questions. Instead, he wrote out a four-page statement claiming that the last time he saw the victim was when he accompanied Jones to a church parking lot to meet the victim on the night the victim was killed, and that Jones was the last person with the victim.

Appellant did not testify at trial. The defense conceded that Appellant argued with the victim, that Appellant punched the victim, and that the victim died as a result. The defense argued that Appellant was overwhelmed by emotion when he struck the victim, that he did not intend to kill the victim, and that he confirmed that the victim was not breathing before he and Williams threw the victim's body into the river. The defense asked the jury to find Appellant guilty of voluntary manslaughter and to acquit him of malice murder and felony murder. The State argued that the victim was still alive when Appellant and Williams threw him into the water, but even if he was not, Appellant was guilty of malice murder and felony murder based on the aggravated assault for striking the victim in the head with his heavy ring and inflicting a fatal injury.

When viewed in the light most favorable to the verdict, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SC 2781, 61 LE2d 560) (1979). See also *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) (" 'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.' " (citation omitted)).

2. Appellant contends that the trial court erred in rejecting his *Batson* claim that the prosecutor used three peremptory strikes to exclude prospective jurors solely because of their race, thereby violating his right to equal protection of the law. See generally *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986). We disagree.

(a) The analysis of a *Batson* challenge involves a three-step process:

> (1) the opponent of a peremptory challenge must make a prima facie showing of racial discrimination; (2) the proponent of the strike must then provide a race-neutral explanation for the strike; and (3) the court must decide whether the opponent of the strike has proven [the proponent's] discriminatory intent.

*Thomas v. State*, 274 Ga. 156, 161 (549 SE2d 359) (2001). Appellant's *Batson* claim focuses on step two.[2] According to Appellant, the State

---

[2] There were 30 prospective jurors – 13 African-American persons and 17 white persons – and each party was allowed nine peremptory strikes. The defense used all nine of its strikes, including three against African-Americans, and the State used eight of its strikes, including five against African-Americans. As a result, the trial jury had four African-American jurors and eight white jurors. Appellant objected to four of the State's peremptory strikes but later waived

failed to offer permissible race-neutral justifications for striking Jurors 12, 20, and 28, and the trial court therefore erred in proceeding to step three of the *Batson* analysis, where the court ultimately found that Appellant had failed to prove the prosecutor's discriminatory intent.

The prosecutor told the court that he struck Juror 12 because "while he was in the courtroom at all times pretty much [he] kept his hand — his head in his hand and was not giving his full attention, either he was tired or disinterested." The prosecutor said that he struck Juror 20 because of "her demeanor that she was also disinterested in — in the case. I mean, she just — just seemed disinterested." The prosecutor said that he struck Juror 28 because, "[I]f I recall correctly . . . I felt some pattern of sympathy . . . in responding to [defense counsel's] questions and just to my question I felt that it's hard to articulate it was just a feeling that this particular juror . . . was perhaps more sympathetic to the defense." The court then asked, "Well, what do you base that on? I mean, was it — some body motion . . . ?" The prosecutor replied, "[b]ody language." The court said, "body language, facial expressions," and the prosecutor said, "Yes, sir." The court said, "Got to tell me what you're basing it on," and the prosecutor responded, "what the court just said. It was body language, facial expressions. And among the jurors that I could see it's something that as a lawyer you just have to feel and that's what I felt."

(b) Appellant does not dispute that these explanations are facially race-neutral. See *Rakestrau v. State*, 278 Ga. 872, 875 (608 SE2d 216) (2005) (recognizing that disinterest during voir dire is a race-neutral explanation for a peremptory strike); *Arrington v. State*, 286 Ga. 335, 340 (687 SE2d 438) (2009) (recognizing that body language and facial expressions may be race-neutral explanations for a peremptory strike). Instead, Appellant claims that these race-neutral explanations were inadequate at *Batson* step two because they were " 'based almost entirely on . . . demeanor,' " and demeanor is not the " 'kind of concrete, tangible, race-neutral, case-related and neutrally applied reason[ ] [that is] sufficient to overcome' " a *Batson* challenge. *Veasey v. State*, 311 Ga. App. 762, 766, n. 11 (717 SE2d 284) (2011) (quoting *Parker v. State*, 219 Ga. App. 361, 364 (464 SE2d 910) (1995) (physical

one of those objections. The State argued at trial that Appellant failed to make a prima facie showing of racial discrimination at *Batson* step one. The trial court did not rule on that issue, however, instead proceeding directly to *Batson* step two by requesting that the prosecutor explain his reasons for the challenged strikes, and the State does not raise this issue on appeal. Accordingly, we assume without deciding that Appellant made the required prima facie showing of racial discrimination.

precedent only)). This argument rests on statements originating in some of our older cases suggesting that at *Batson* step two, the proponent of the challenged strike can carry his burden of production only by offering an explanation that is "case-related" and "specific" in addition to being race-neutral. E.g., *Blair v. State*, 267 Ga. 166, 166 (476 SE2d 263) (1996); *Turner v. State*, 267 Ga. 149, 151 (476 SE2d 252) (1996).

However, the language from *Parker* quoted in *Veasey*, and the suggestion in some of our cases that *Batson* step two requires an explanation that is not only race-neutral but also "case-related" and "specific," are not correct statements of the law. To the contrary, both the United States Supreme Court and this Court have squarely held that a peremptory strike based upon a juror's demeanor during voir dire may be race-neutral at *Batson* step two. See *Snyder v. Louisiana*, 552 U. S. 472, 476 (128 SC 1203, 170 LE2d 175) (2008); *Arrington*, 286 Ga. at 340. At step two, the proponent of the strike need only articulate a facially race-neutral reason for the strike. Step two

> does not demand an explanation that is persuasive, or even plausible. "At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral."

*Purkett v. Elem*, 514 U. S. 765, 768 (115 SC 1769, 131 LE2d 834) (1995) (citation omitted). See also *Rose v. State*, 287 Ga. 238, 241 (695 SE2d 261) (2010) ("Although a striking party's explanation for the exercise of a peremptory strike may be superstitious, silly, or implausible, the striking party's burden is satisfied as long as the articulated reason is race or gender-neutral.").

Thus, to carry the burden of production at step two, the proponent of the strike need not offer an explanation that is "concrete," "tangible," or "specific." The explanation need not even be "case-related." The explanation for the strike only needs to be facially race-neutral. See *Purkett*, 514 U. S. at 766 (accepting as race-neutral the explanation that a struck juror "had long hair" and "a mustache and a goatee type beard" and "the mustaches and the beards look suspicious to me"). Any statements to the contrary in *Veasey, Parker, Blair, Turner*, and any other Georgia case are hereby disapproved.[3]

---

[3] The concurring opinion argues that we should depart from *Purkett* by applying the Georgia Constitution's equal protection guarantee differently than the equal protection clause in the Fourteenth Amendment to the United States Constitution, citing a case in which Justice Carley's concurring opinion acknowledged this Court's authority to do that. See *Stephens v.*

We emphasize, however, that case-relatedness, specificity, and similar considerations remain relevant to a *Batson* challenge. If the proponent of the strike carries its burden by providing a race-neutral explanation for the peremptory strike, the trial court must advance to *step three* of the *Batson* analysis and decide whether the opponent of the strike has proven the proponent's discriminatory intent in light of "all the circumstances that bear upon the issue of racial animosity." *Snyder*, 552 U. S. at 478. This involves an evaluation of the credibility of the strike's proponent, which in turn may depend on the specificity and case-relatedness of the explanation for the strike given at step two. The trial court may conclude that a vague explanation, or one that is in no way case-related, signals an unwillingness by the proponent to provide the real reason for the strike. And the "proffer of [a] pretextual explanation naturally gives rise to an inference of discriminatory intent." Id. at 485. " 'At (the third) stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination.' " Id. (quoting *Purkett*, 514 U. S. at 768).

Like our concurring colleague, we look to our State's trial judges to ferret out and eliminate invidious discrimination in the jury selection process. But they should do so using the well-defined framework set forth in *Batson, Purkett*, and the similar decisions of this Court. If trial judges instead were given undefined "flexibility" to "shape and mold the law to fit the particular situation," Concurring Op. at 63, the result would be unequal and essentially unreviewable legal standards applied in various courtrooms across Georgia. That would not advance our shared goal of ensuring that "race and gender [have] no place in the administration of justice." Id.

(c) With respect to Juror 28, Appellant offers an additional argument in support of his claim that the State failed to carry its

---

*State*, 265 Ga. 356, 360 (456 SE2d 560) (1995) (Carley, J., concurring). But Justice Carley went on to explain that, "[w]hen assessing equal protection challenges, this court has consistently applied the *analysis* established by the Supreme Court of the United States in making this determination," id. (emphasis in original), and only one other Justice joined Justice Benham's dissent urging the Court to deviate from that approach, see id. at 370-371 (Benham, P. J., dissenting). The concurring opinion also says that "multiple states have held that their state constitution demands more of the proponent of a strike than is required under the United States Constitution after the *Purkett* holding." Concurring Op. at 61-62. But it cites cases from only two states – and the California case it cites later had rehearing granted and was ordered not to be officially published, so it may not be relied on even in California courts. See *People v. Jamison*, 43 Cal. App. 4th 560 (1996) (depublished). As we recently noted, "detailed analysis of [the] specific constitutional language, history, and precedent and comparison to that of the [United States Constitution]," rather than "mere ipse dixit, must support the conclusion that the state constitution provides more protection with regard to the particular point at issue." *Grady v. Unified Govt. of Athens-Clarke County*, 289 Ga. 726, 731 & n. 3 (715 SE2d 148) (2011).

burden of production at step two of the *Batson* analysis. As recounted above, the prosecutor had some difficulty explaining why he struck Juror 28. The prosecutor said that he detected a "pattern of sympathy" in Juror 28's responses to defense counsel, giving him "just a feeling" that was "hard to articulate" that the juror "was perhaps more sympathetic to the defense." The trial court then asked the prosecutor if his conclusion about Juror 28's sympathies was based on her "body language, facial expressions," and the prosecutor responded, "Yes, sir . . . what the court just said. It was body language, facial expressions. And among the jurors that I could see it's something that as a lawyer you just have to feel and that's what I felt." According to Appellant, Juror 28's "body language" and "facial expressions" cannot count as race-neutral reasons at *Batson* step two because these reasons originated with the trial court and not the prosecutor. In support of this argument, Appellant relies on Division 5 of *Walton v. State*, 267 Ga. 713 (482 SE2d 330) (1997), a division of that opinion that was not joined by a majority of the Court.

In *Walton*, the prosecutor initially offered two reasons for a peremptory strike. See 267 Ga. at 718-719 (plurality opinion of Benham, C. J.). The trial court then observed that the prospective juror's cousin was a former president of the Georgia Association of Criminal Defense Lawyers, and the prosecutor said that he "had borne that fact in mind" in deciding to strike the juror. Id. at 719. The three-Justice plurality found that the first two reasons offered for the strike were unsupported by the record. See id. The plurality then said that the third reason would not be considered because it was "supplied by the trial judge instead of the attorney for the side exercising the strike," reasoning that "the trial judge, who is the arbiter of whether an attorney has proffered a race-neutral rationale for peremptory strikes, cannot be perceived as providing the very rationale which the judge must then adjudicate as racially neutral or racially based." Id. at 719-720.

Two Justices agreed that *Batson* required reversal because at least one of the reasons the prosecutor gave was racially motivated, but they declined to join "all that is said in Division 5 of the majority opinion." 267 Ga. at 720 (Carley, J., joined by Sears, J., concurring specially). The remaining two Justices explicitly rejected the plurality's reasoning in Division 5, noting that the prosecutor "affirmatively stated that he recollected the relationship" between the prospective juror and the criminal defense lawyers association and "actively endorsed to the trial court that the [juror's] cousin's affiliation to the defense group was a factor in his decision to exercise" the challenged strike. Id. at 722 (Hunstein, J., joined by Hines, J., dissenting). The dissent concluded, "Under these circumstances, we cannot presume

that the prosecutor's endorsement of the race-neutral reason was purely pretextual merely because it was first mentioned by the trial court." Id. at 722-723.

The purpose of *Batson* step two is to uncover the actual thinking behind the proponent's decision to strike a prospective juror, including any unconscious bias or stereotypes, so that the trial court can determine at step three whether the opponent of the strike has proven the proponent's subjective discriminatory intent. Observing the proponent of the strike as he struggles to put his thoughts into words provides the court with information that may prove important in evaluating his credibility at step three of the analysis. Interrupting the proponent with the court's suggestions of possible race-neutral explanations short-circuits this process, making it more likely that the proponent will provide pretextual reasons and thus less likely that invidious discrimination will be revealed and eliminated from the jury selection process. It is also unseemly for the trial court to "be perceived as providing the very rationale which the judge must then adjudicate as racially neutral or racially based." *Walton*, 267 Ga. at 719 (plurality opinion). Accordingly, we agree with the *Walton* plurality that trial courts should resist the urge to intervene and suggest potential explanations when the proponent of a peremptory strike is struggling to articulate his thinking so that he can carry his burden of production at *Batson* step two.

However, we agree with the *Walton* dissenters that the plurality erred in elevating this best practice to the level of a constitutional command. Nothing in *Batson* or its progeny suggests that an appellate court is prohibited from considering a proponent's race-neutral explanation for a peremptory strike offered at *Batson* step two solely because the words used to articulate the explanation were first uttered by the trial court rather than the proponent. Under the plurality's approach, if the proponent has a perfectly valid and credible race-neutral explanation for a peremptory strike but does not express it before the trial court does, that explanation cannot be considered, and a strike that was not in fact motivated by racial discrimination nonetheless is invalidated as a violation of equal protection. A *Batson* violation does not turn on perceptions of the trial court; it requires that the party exercising a peremptory strike actually did so with invidious discriminatory intent. We therefore decline Appellant's invitation to impose such an addition to the three-step analysis set forth in *Batson* and repeatedly reaffirmed by both this Court and the United States Supreme Court, and Division 5 of *Walton* is hereby disapproved.

(d) The trial court observed first-hand both the challenged jurors' demeanor during voir dire and the prosecutor's demeanor as he

explained the reasons for the peremptory strikes before finding, at step three of the *Batson* analysis, that Appellant failed to carry his burden to prove discriminatory intent on the part of the prosecutor in striking Jurors 12, 20, and 28. The prosecutor's explanations may not be compelling, but the trial court's ultimate finding is entitled to great deference on appeal, and Appellant has not demonstrated that it was clearly erroneous. See *Blackshear v. State*, 285 Ga. 619, 620 (680 SE2d 850) (2009). For the foregoing reasons, Appellant has failed to show that the trial court committed reversible error in rejecting his *Batson* claim.

3. Appellant contends that the trial court abused its discretion in denying his repeated mistrial motions after the State played portions of his videotaped police interviews in which he admitted that he was on probation, had been arrested for fighting, and had been convicted of burglary. However, Appellant forfeited this claim by failing to object when the DVDs of the interviews were offered into evidence at trial, before they were played for the jury; indeed, his counsel stated affirmatively on the record that Appellant had no objection to their admission. Accordingly, Appellant is precluded from raising this claim on appeal. See *Wilson v. State*, 277 Ga. 114, 117 (587 SE2d 9) (2003); *Rich v. State*, 254 Ga. 11, 13-14 (325 SE2d 761) (1985).

4. Appellant asserts that he received ineffective assistance of trial counsel. To prevail on this claim, he must show that his counsel's performance was professionally deficient and that, but for the deficiency, there is a reasonable probability that the outcome of the trial would have been more favorable to him. See *Strickland v. Washington*, 466 U. S. 668, 687, 694 (104 SC 2052, 80 LE2d 674) (1984). He has not met this burden.

Appellant points to five instances of allegedly deficient performance by his trial counsel. However, in examining an ineffectiveness claim, we need not address both components of the *Strickland* test if the defendant made an insufficient showing on one. See *Watkins v. State*, 289 Ga. 359, 362 (711 SE2d 655) (2011). In particular, we " 'need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.' " *Long v. State*, 287 Ga. 886, 891 (700 SE2d 399) (2010) (quoting *Strickland*, 466 U. S. at 697). Pretermitting the question of deficient performance, we hold that Appellant failed to show resulting prejudice.

The first three alleged errors relate to the admission of the bad character evidence discussed in Division 3 above. The passing references in the police interviews to Appellant's probation status, his prior arrest for fighting, and his burglary conviction were buried in four long interview videotapes that were played during the testimony

of three different witnesses. On the other hand, the evidence of Appellant's guilt was strong. After several hours of obvious lies and feeble attempts to throw the police off his trail, including by falsely implicating other individuals in the murder who he knew were not involved in any way, Appellant admitted punching the victim in the head, knocking him unconscious, and then dumping him in the river, admissions that were corroborated by physical evidence. Moreover, the court gave the jury a sua sponte cautionary instruction, and the prosecution did not mention the disputed evidence in closing argument. Thus, Appellant failed to show a reasonable probability that, but for the alleged errors related to the bad character evidence, the outcome of the trial would have been more favorable to him.

The remaining two instances of allegedly deficient performance by trial counsel relate to the medical examiner's testimony about the theory of "dry drowning," which Appellant dismisses as junk science. Even if we were to accept Appellant's characterization of the theory, we could not conclude that counsel's alleged errors with respect to this testimony had an effect on the jury's verdict. In closing argument, the State emphasized to the jury that it need not find that the victim drowned to convict him of malice murder and felony murder in light of the defense's concession that Appellant struck the victim in the head and knocked him unconscious before putting him in the water, because it was undisputed that these acts led directly to the victim's death. The defense at trial was not focused on the cause of death, but on Appellant's claim that he was overwhelmed by emotion and did not intend to kill the victim when he punched him. Thus, Appellant failed to show a reasonable probability that, but for the alleged errors related to the expert testimony, the verdict would have been more favorable to him.

Finally, even if trial counsel erred in all five of the ways Appellant alleges, Appellant has not demonstrated a reasonable probability that the cumulative effect of the alleged errors affected the outcome of the proceeding. See *Schofield v. Holsey*, 281 Ga. 809, 811, n. 1 (642 SE2d 56) (2007). Accordingly, the trial court properly rejected Appellant's ineffective assistance of counsel claim.

*Judgment affirmed. All the Justices concur, except Benham, J., who concurs specially.*

BENHAM, Justice, concurring specially.

While I agree with Divisions 1, 3 and 4 of the majority opinion, I can agree only in judgment as to Division 2. I must write separately because I disagree with the majority's disapproval of the following cases: *Walton v. State*, 267 Ga. 713 (482 SE2d 330) (1997); *Blair v. State*, 267 Ga. 166 (476 SE2d 263) (1996); *Turner v. State*, 267 Ga. 149

(476 SE2d 252) (1996); and *Veasey v. State*, 311 Ga. App. 762 (717 SE2d 284) (2011). What the majority opinion finds unacceptable in these cases is language where the second step of the *Batson* analysis requires that the explanation given for a strike be "case related," "specific," "concrete," and "tangible." In abolishing this approach, the majority opinion cites *Purkett v. Elem*, 514 U. S. 765 (115 SC 1769, 131 LE2d 834) (1995); *Snyder v. Louisiana*, 552 U. S. 472 (128 SC 1203, 170 LE2d 175) (2008); *Rose v. State*, 287 Ga. 238 (695 SE2d 261) (2010); and *Arrington v. State*, 286 Ga. 335 (687 SE2d 438) (2009).

A little background information may be helpful in considering the approach taken by this special concurrence. The legal journey to a destination in the law where race and gender are impermissible factors in determining whether a person is allowed to serve on a jury, and a litigant's right to have a jury untainted by race and gender consideration, has been long and arduous. It has by no means been a short and uneventful journey. It has moved at a snail's pace through treacherous paths with pitfalls, barriers and obstacles along every step of the way. The journey from *Swain v. Alabama* to *Batson v. Kentucky* has taken over twenty years. *Swain v. Alabama*, 380 U. S. 202 (85 SC 824, 13 LE2d 759) (1965), overruled by *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986). During that period, countless citizens were denied opportunities to serve on juries throughout this country merely because of their race or gender. This history is indelibly impressed in the minds of hundreds of thousands of hard-working, law-abiding, and self-respecting citizens who were denied opportunities to serve on juries merely because of race or gender. I can remember when the first African-American in my community was allowed to serve on a jury, and the effect that this had on the community as a whole.[4]

As a young lawyer I watched as prospective jurors were stricken from the jury pool time and time again merely because of their race or gender. As president of my local bar association I would watch the prospective jurors, with a summons in hand, beaming with pride and anticipation that they too would be allowed to become a part of

---

[4] It was the early 1950s when our neighbor, Rev. Moses Slocum, became the first black person to serve on a jury in our circuit. His service was a moment of celebration for our entire community. Rather than becoming angry as to the lack of service, we looked to a brighter day when more would be allowed to serve. We were mindful of the words of Omar Khayyám (1048-1131), a Persian polymath, renowned as a mathematician, astronomer, philosopher, and poet.

The moving finger writes and having writ moves on,
All your piety and all of your wit
Can't call it back to cancel a line of it.
Nor all of your tears wash a word of it.

government as jurors. As they entered the jury box they made sure that they were well-groomed, polite and well-mannered. They would look up at the judge and out at the lawyers with pride and respect. But, as the process began, their joy turned to gloom as white citizens were retained and black citizens were stricken even though they gave almost identical answers. Looking disappointed and dejected they would leave the jury box crestfallen, sad, and feeling less than a full citizen.[5] It is with this background in mind that I consider the action of the majority in disapproving the efforts in a line of cases that sought to flesh out, in a more meaningful and practical way, the right to jury service.

I do not take issue with *Batson*, *Purkett*, and the line of cases cited by the majority; I acknowledge that as a state we must accept the United States Supreme Court's determinations as to the United States Constitution as well as federal statutes and regulations. However, as the Supreme Court of Georgia, we are free to interpret the Georgia Constitution in a manner that acknowledges the federal floor, but nevertheless raises that floor to provide our citizens with greater rights. *Stephens v. State*, 265 Ga. 356, 360 (456 SE2d 560) (1996) ("it is certainly clear that this court may interpret the equal protection clause of our state constitution as affording greater rights to our citizens than does the federal equal protection clause as interpreted by the Supreme Court of the United States"). Regarding the point of contention in this case, multiple states have held that their state constitution demands more of the proponent of a strike than is required under the United States Constitution after the

---

[5] It was on one of these many occasions that an African-American woman approached me as the president of the local bar association. She said the following:

> I dropped everything that I was doing just to come to court and serve on the jury. I was well-dressed, well-mannered, well-educated and respectful. It was my chance to finally become a part of the government of a country and state that I love and honor. I answered all of the questions posed to me, the same as the other white jurors. Yet the whites were accepted and I was rejected. I feel I have been subpoenaed to court to be made a fool of.

She then paused and said:

> If I am not good enough to serve as a juror, then I am not good enough to cooperate with the administration of justice. In the future, if I see a crime committed I will not volunteer to be a witness. If I am asked to be a part of neighborhood watch I will refuse to do so. If I am asked to be a part of some community activity designed to support the court system I will decline the opportunity. And if I am subpoenaed to come to court again to serve on a jury, I will refuse to do so.

I realized then that the damage done when legitimately qualified citizens are denied service goes beyond the denial of a fair trial to those who appear before the bar of justice. The damage is done to the very foundation of justice itself. It erodes respect for our legal process. It causes citizens not to cooperate with law enforcement and those who administer our system of justice. This damage can be long-term and deep-seated.

*Purkett* holding. See *People v. Jamison*, 43 Cal. App. 4th 560 (50 Cal. Rptr. 2d 679, 686) (1996) ("it is appropriate to require that the prosecutor's explanation be race neutral, reasonably specific, and trial related . . . [b]ecause California law is controlling, we are not required to go down the path created by the *Purkett* majority"). See also *Looney v. Davis*, 721 So2d 152, 164 (Ala. 1998) (declining to follow "*Hernandez* and *Purkett*" regarding the scrutiny applied to reasons given by a proponent of a peremptory strike, instead relying on "adequate and independent state law").

The position taken by these states is not foreign to Georgia. In *Parker v. State*, 219 Ga. App. 361, 364 (464 SE2d 910) (1995) (physical precedent only), a case heard six months after *Purkett* was decided, our Court of Appeals reversed a trial court's rejection of a criminal defendant's *Batson* challenge, stating:

> [W]e cannot condone the exclusion of the three prospective African-American jurors based almost entirely on their demeanor. The prosecution's reasons for striking these African-American prospective jurors were not the kind of concrete, tangible, race-neutral, case-related and neutrally applied reasons sufficient to overcome Parker's prima facie case.

This holding directly contradicts the *Purkett* decision, which permits a proponent to offer justifications for strikes that are not "persuasive, or even plausible" and still meet their burden under step two of the *Batson* test. *Purkett*, supra, 514 U. S. at 768. In *Parker*, Judge Pope authored a special concurrence in which he argued that the majority's ruling could only be valid as an interpretation of the Georgia Constitution, given the recent *Purkett* decision which demanded a different outcome under federal law. *Parker*, supra, at 364. Even though the majority in *Parker* did not openly renounce the *Purkett* decision, our courts continued for many years to require that justifications for peremptory strikes be "specific," "case-related," and "concrete." *Ridley v. State*, 235 Ga. App. 591, 592 (510 SE2d 113) (1998) ("[i]n carefully scrutinizing the State's reasons, we stress that they cannot be 'too vague, too subjective, . . . non-specific, (or) non-case related' "); *Hood v. State*, 245 Ga. App. 391, 393 (537 SE2d 788) (2000) (affirming the lower court's denial of a *Batson* challenge as "the inattentiveness of an apparently sleeping prospective juror is certainly a case-related, race-neutral reason for exercising a peremptory challenge"); *George v. State*, 263 Ga. App. 541, 545 (588 SE2d 312) (2003) ("the prosecutor offered no explanation about how juror 12's earring was *related to the case at hand* or how it would render him unable to be a fair and impartial juror") (emphasis supplied).

The reluctance of Georgia courts to accept "silly" and "superstitious" justifications suggests agreement with the dissent in *Purkett*, which states " '[i]t would take little effort for prosecutors who are of such a mind to adopt rote "neutral explanations" which bear facial legitimacy but conceal a discriminatory motive.' " *Purkett v. Elem*, supra, 514 U. S. at 773. The dissenters in *Purkett*, like the majority in *People v. Jamison*, supra, and *Looney v. Davis*, supra, sought not to expand *Batson* to new heights and difficulty, but to adhere to the law developed in *Batson* itself: "the prosecutor therefore must articulate a neutral explanation *related to the particular case* to be tried." *Batson v. Kentucky*, supra, 476 U. S. at 98 (emphasis supplied).

For over 25 years the decisions of this Court and our Court of Appeals have stood as a tool to help trial judges deal with all kinds of difficult and troubling issues, including those of race and gender. Trial judges need flexibility in using legal tools so that they may shape and mold the law to fit the particular situation. The majority opinion has given them an inflexible formalistic approach that elevates form over substance. There are times during the jury selection process that the trial court needs to be able to compress the process to get to the heart of the matter so that justice can be done not only to the parties, but also to the prospective jurors. Our trial judges are remarkably resourceful and are peculiarly equipped to get to the heart of matters. Often-times it is necessary to put substance over form to reach the right conclusion. Such an approach was evident years ago in my small north Georgia circuit, when I brought to the attention of the District Attorney and the judge that prospective jurors felt unappreciated when they were stricken during the peremptory challenge process for reasons of race and gender. It was at that moment that the trial judge turned to the District Attorney and said, "I know the law allows you to strike a juror for any reason, but I will not tolerate jurors being stricken because of race and gender." The District Attorney responded by saying, "Judge, I agree with you and I will instruct my staff accordingly." This conversation took place before *Batson, Georgia v. McCollum*, 505 U. S. 42 (112 SC 2348, 120 LE2d 33) (1992), and the host of related cases that were eventually decided by the United States Supreme Court. This colloquy reflected the sentiment of a small north Georgia circuit that race and gender had no place in the administration of justice.

To the credit of prospective jurors we sincerely believe that they enter upon the service in an environment that is free of discrimination based on race or gender. We offer them these words of support and

comfort by an unknown poet:

> You are your country's keeper
> Your government is but you
> You are the woof of her fabric
> Whether she be strong or weak or true
> Yes you are your country's keeper
> And yours forever the blame
> Whether she rises in her glory
> Or withers in her shame.

One size does not fit all. It is this flexibility that I seek to preserve for trial judges and lawyers throughout this state, and it is with respect for our use of the jury system that I pen this special concurrence.

DECIDED NOVEMBER 19, 2012.

*Kevin C. Armstrong*, for appellant.
*Gregory W. Edwards, District Attorney, Nicholas E. Deeb, Assistant District Attorney, Samuel S. Olens, Attorney General, Paula K. Smith, Senior Assistant Attorney General, Katherine L. Iannuzzi, Assistant Attorney General*, for appellee.