295 Ga. 559
FINAL COPY

S14A0563.  HEARD v. THE STATE.

NAHMIAS, Justice.

Derrick Heard appeals his conviction for the murder of Robert Ledbetter. Appellant contends that his constitutional right to a speedy trial was violated; that the trial court erred by allowing two of the State's peremptory strikes; and that the court erred by preventing him from introducing certain evidence about Ledbetter.  We affirm.[1]

---

[1] Ledbetter was killed on August 11, 2003.  On August 19, 2003, Appellant was arrested for murder, and on November 13, 2003, a DeKalb County grand jury indicted him for malice murder, felony murder, and possession of a firearm during the commission of a felony.  On May 9, 2005, the trial court filed a nolle pros order dismissing the indictment.  On October 27, 2009, after further investigation, Appellant was again arrested for murder, and on November 29, 2009, a DeKalb County grand jury indicted him for malice murder, felony murder, aggravated assault, and possession of a firearm during the commission of a felony.  Appellant's trial began on June 7, 2010.  Before jury selection, the trial court dismissed the non-murder charges based on the statute of limitations.  On June 11, the jury found Appellant guilty of malice murder and felony murder.  The felony murder verdict was vacated by operation of law, and the court sentenced Appellant to life in prison for malice murder.  Appellant filed a motion for new trial on July 8, 2010, which he amended on September 26, 2011.  After an evidentiary hearing, the trial court entered an order denying the motion on November 29, 2011, and on December 20, 2011, Appellant filed a notice of appeal to this Court.

On February 13, 2012, Appellant revoked his prior oral waiver of his appellate counsel's conflict of interest and requested the appointment of conflict-free counsel; that same day, he filed a motion to remand the case to raise claims of ineffective assistance of trial counsel.  On February 27, 2012, this Court entered an order granting the motion, dismissing the appeal, and remanding the case to the trial court "for the limited purpose raised in such motion."  Conflict-free counsel was appointed, and Appellant amended his new trial motion on May 22, 2012, and again on May 16, 2013.  At a hearing on July 18, 2013, Appellant affirmatively waived any claims of ineffective assistance of trial counsel, and on August 16, 2013, the trial court entered an order denying the new trial motion as amended.  On September 24, 2013, Appellant filed a motion for out-of-time appeal, which the trial court granted on October 2, 2013.  On October 22, 2013, Appellant filed a notice of

1.     The evidence at trial, viewed in the light most favorable to the verdict, showed the following.  In 2000, Robert Ledbetter was in Detroit working for a record company, where he met aspiring hip-hop artists Farlandis Dillard and Emery Love.  Dillard and Love left the record label in 2001, and Dillard moved to Phoenix, taking a job as a mall security guard.  In July 2003, Love ran into Ledbetter, who had also left the record company and moved away but was back in Detroit for a visit.  Ledbetter talked to Love about music opportunities in Atlanta, where Ledbetter was moving.

At Ledbetter's request, Love called Dillard and convinced him to move to Atlanta to pursue their music career with Ledbetter's help.  Dillard arranged a job transfer to a mall in Atlanta and took a bus to Detroit to meet up with Love and Ledbetter.  Ledbetter and Dillard then took a bus to Atlanta, but Love stayed behind for a while.  When Ledbetter and Dillard arrived in Atlanta, Appellant, who Ledbetter said was his cousin, picked them up from the bus station and drove them to an apartment complex, but they were not able to lease an apartment there.  Appellant said that Ledbetter and Dillard could stay with him

appeal, and the case was docketed in this Court for the January 2014 term and submitted for decision on the briefs.

for a few days until they found an apartment.

Appellant lived in a house with his ex-wife, Liticia Heard (Ms. Heard), and their 12-year-old son. Ledbetter and Dillard stayed there for a few weeks, as they were unable to secure an apartment. Dillard ultimately decided to return to Phoenix as soon as he received his last paycheck from his job there, telling Love on the telephone that things "fell through" in Atlanta and not to come down.

On the afternoon of August 11, 2003, Dillard's last paycheck from his Phoenix job finally arrived, and he confirmed that there was a bus leaving for Phoenix that night. Appellant agreed to take Dillard to the bus station, and Dillard packed his things. That evening, Appellant and Ledbetter got into an argument, and Ledbetter pushed Appellant and then went upstairs. Appellant was angry and followed Ledbetter to the bottom of the stairs but stopped. Dillard went down to the basement to give Appellant time to cool off, but Appellant was still upset an hour later when he came down to the basement, telling Dillard, "I'm going to F your boy up." Appellant and Dillard watched television for a while, and Ledbetter eventually joined them. As the evening news was ending, Appellant told Dillard to go upstairs and make sure that he

3

had all his things packed, and Dillard did so.

Ten or 15 minutes later, Dillard came back down to the basement. When he reached the bottom of the stairs, he saw Ledbetter, who was lying on the couch on his back, roll over onto his side to face the couch, telling Appellant, "F you." Dillard then saw Appellant shoot Ledbetter three times in the head with a handgun. Right after that, Dillard heard Appellant's son come in the door upstairs, and Appellant ordered Dillard to go up and keep his son from coming down to the basement. Dillard went upstairs and spoke to the son, who left for a friend's house a few minutes later. Dillard then returned to the basement, where he saw that Appellant had rolled up Ledbetter's body in a large floor rug secured with duct tape. Appellant told Dillard to go upstairs and retrieve bleach from under the kitchen sink. Dillard complied, and he stood by silently as Appellant cleaned blood off the wall in the basement.

Appellant then ordered Dillard to help him dispose of the body, which they moved with a wheelbarrow to the back of Appellant's van. After that, Ms. Heard came home, and Appellant and Dillard left in the van a few minutes later. They stopped at a gas station about a mile away and then at a check cashing store so that Dillard would have money to buy his bus ticket back to Phoenix.

4

Appellant then drove to the parking lot of an abandoned building, where he and Dillard dumped the body after Appellant doused the rug containing the body with gasoline and lit it on fire. As they drove away, Appellant warned Dillard not to tell anyone about what had happened, saying, "just take this s**t to your grave." Appellant dropped Dillard off at the bus station, and Dillard returned to Phoenix. Appellant told Ms. Heard when he got home that he had dropped off both Ledbetter and Dillard at the bus station.

Ledbetter's smouldering remains were discovered the next morning. Responding officers found a return address label for Ms. Heard nearby and recovered three shell casings from Ledbetter's pocket. An autopsy revealed that Ledbetter died from three gunshot wounds to the head. The following day, August 13, officers went to Ms. Heard's house. Appellant was there when the officers arrived but left on foot while Ms. Heard went to meet the officers at the door; he did not come home that night. Ms. Heard invited the officers inside, where they saw packed luggage in the kitchen. Ms. Heard said that she did not know whose bags they were and had not seen them until she went to the door to meet the officers. Ms. Heard consented to a search, and she and her son identified an item from the luggage as belonging to Ledbetter.

5

The officers then obtained a search warrant for the house and for the vehicles shared by Appellant and Ms. Heard. Blood samples from the couch and carpet in the basement were matched to Ledbetter, and the three bullets recovered from his skull were matched to a gun registered to Ms. Heard that officers found in the trunk of one of the cars that she and Appellant shared. Gas cans and bullets for the gun were also found at the house.

A month or so after Ledbetter was killed, Love moved to Phoenix. When Love asked Dillard what had happened in Atlanta, Dillard said that he saw Appellant shoot and kill Ledbetter and that Appellant then forced him to help dispose of the body. Dillard and Love testified at Appellant's trial, as did Ms. Heard.

When viewed in the light most favorable to the verdict, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of malice murder. See Jackson v. Virginia, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also Vega v. State, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).

6

2.      Appellant contends that the State violated his constitutional right to a speedy trial and the trial court therefore erred in denying his April 29, 2010 motion to dismiss the second indictment. We disagree.

(a)      Constitutional speedy trial claims are evaluated under the two-part framework set out in Barker v. Wingo, 407 U. S. 514 (92 SCt 2182, 33 LE2d 101) (1972), and refined in Doggett v. United States, 505 U. S. 647 (112 SCt 2686, 120 LE2d 520) (1992). See Ruffin v. State, 284 Ga. 52, 55 (663 SE2d 189) (2008). The first part requires the trial court to determine whether the time between the defendant's arrest or indictment and his trial was long enough to be considered presumptively prejudicial to the defendant. See id. If the presumptive prejudice threshold was crossed, the court proceeds to the second part of the framework, applying "a context-focused, four-factor balancing test to determine whether [the defendant] was denied the right to a speedy trial." Sweatman v. State, 287 Ga. 872, 873 (700 SE2d 579) (2010). The four factors that the court must examine are: (1) the length of the delay; (2) the reasons for it; (3) the defendant's assertion of his right to a speedy trial; and (4) prejudice to the defendant. See Doggett, 505 U. S. at 651; Barker, 407 U. S. at 530-532. However, these four factors have "no talismanic qualities" and "must be

7

considered together with such other circumstances as may be relevant" in light of the animating principles of the speedy trial guarantee. Barker, 407 U. S. at 533.

The Barker-Doggett framework "'necessarily compels courts to approach speedy trial cases on an ad hoc basis,' a task better suited to trial courts than appellate courts." Sweatman, 287 Ga. at 873-874 (quoting Barker, 407 U. S. at 530). A trial court's discretion in applying this framework is "'substantial' and 'broad,'" and our review of the trial court's resolution of a speedy trial claim is limited to determining whether the court abused its discretion. See State v. Buckner, 292 Ga. 390, 391 & n. 3 (738 SE2d 65) (2013) (citations omitted). We must accept the court's findings of fact if the record contains any evidence to support them, and we will defer to the court's "ultimate conclusion . . . unless it amounts to an abuse of discretion, even though we might have reached a different conclusion were the issue committed to our discretion." Id. at 391.

(b) The record shows that the prosecution of this case proceeded as follows. Appellant was first arrested for Ledbetter's murder on August 19, 2003. He was indicted on November 13, 2003, and released on bond on October 16, 2004. At a hearing on May 3, 2005, the State presented an order to nolle

8

pros the indictment; Appellant objected, but the trial court signed the order, which was then filed on May 9. The day after the nolle pros order was signed, Appellant filed an out-of-time statutory speedy trial demand. More than two years later, on July 20, 2007, the State responded to Appellant's demand, which the trial court denied as moot on August 23, 2007.

In November 2007, a juvenile court investigator reviewed the case file in his spare time at the prosecutor's request. Using information in the case file, the investigator came up with the name "Farlandis Gus Dillard," and he was later able to find Dillard's current address in Phoenix. The investigator obtained a photo of Dillard and showed it to Appellant's son, who confirmed that the man in the photo was the person who stayed with Ledbetter at Appellant's home before Lebetter's murder. In August 2009, the investigator flew to Phoenix and interviewed Dillard, who implicated Appellant in the murder. On October 27, 2009, Appellant was again arrested for murder, and he was indicted again on November 29, 2009.

On January 4, 2010, the trial court denied Appellant's motion for bond, and he was arraigned on April 26, 2010. On April 29, 2010, Appellant filed a motion to dismiss the second indictment due to the State's alleged violation of

9

his constitutional right to a speedy trial. The trial court denied the motion after an evidentiary hearing before jury selection on the first day of the trial, June 7, 2010.

(c)    Contrary to Appellant's argument, the trial court did not err by limiting the speedy trial inquiry to the approximately 28 months when charges were actually pending against him.[2]  "[T]he Speedy Trial Clause has no application after the Government, acting in good faith, formally drops charges." United States v. MacDonald, 456 U. S. 1, 7 (102 SCt 1497, 71 LE2d 696) (1982).[3]  It is clear that the State acted in good faith in this case when it asked

---

[2]  The 28 months is composed of the 20 months and 20 days from Appellant's first murder arrest in August 2003 to the May 2005 entry of the nolle pros order, plus the seven months and 11 days from his second murder arrest in October 2009 to his June 2010 trial.

[3]  In MacDonald, the United States Supreme Court considered whether the time between the dismissal of military charges and a subsequent indictment on civilian criminal charges for the same crimes should be included in deciding whether a defendant's constitutional right to a speedy trial was violated.  See 456 U. S. at 3.  The Court said no.  See id. at 6.  The Court discussed the periods of time to which the speedy trial guarantee applies as follows:

> The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial. . . ."  A literal reading of the Amendment suggests that this right attaches only when a formal criminal charge is instituted and a criminal prosecution begins.  In United States v. Marion, 404 U. S. 307, 313 [(92 SCt 455, 30 LE2d 468) (1971) we held that the Speedy Trial Clause . . . does not apply to the period before a defendant is indicted, arrested, or otherwise officially accused . . . .  In addition to the period after indictment, the period between arrest and indictment must be considered in evaluating a Speedy Trial Clause claim.  Although delay prior to arrest or indictment may give rise to a due process claim under the Fifth Amendment, see United States v. Lovasco, 431 U.S. 783, 788-789 [(97 SCt 2044, 52 LE2d 752)] (1977), or to a claim under any applicable statutes of

10

the court to nolle pros the first indictment. Rather than improperly "dismiss[ing] and later reinstitut[ing] charges to evade the speedy trial guarantee," id. at 10, n. 12, the record shows that the State sought to dismiss the first indictment because it doubted that it had sufficient evidence to convict Appellant, and arrested him again only after obtaining new evidence from the only eyewitness to the murder.

Thus, the delay at issue in this case was the 28 months examined by the trial court, and we will assume without deciding that this period "crossed the threshold dividing ordinary from 'presumptively prejudicial' delay." Doggett, 505 U. S. at 651-652 (citation omitted). We therefore proceed, as did the trial court, to the second part of the Barker-Doggett framework.

(d) The trial court made no express finding regarding "the extent to which the [28-month] delay stretche[d] beyond the bare minimum needed to trigger judicial examination of [Appellant's speedy trial] claim." Doggett, 505

limitations, no Sixth Amendment right to a speedy trial arises until charges are pending. Similarly, the Speedy Trial Clause has no application after the Government, acting in good faith, formally drops charges. Any undue delay after charges are dismissed, like any delay before charges are filed, must be scrutinized under the Due Process Clause, not the Speedy Trial Clause.

MacDonald, 456 U. S. at 6-8 (citations omitted).

11

U. S. at 652.  However,

> [a] delay approaching one year is sufficient in most cases to raise a presumption of prejudice and to warrant a more searching inquiry . . . , keeping in mind that "the delay that can be tolerated in a particular case depends to some extent on the complexity and seriousness of the charges in that case."

State v. Alexander, 295 Ga. 154, 156, 157 (758 SE2d 289) (2014) (citation omitted).  Thus, the length of delay weighed at the second part of the Barker-Doggett framework extended beyond the one-year mark by at most 16 months.

Appellant and the State agree that the principal reason for the delay was the State's failure to identify and locate the man who stayed with Ledbetter at Appellant's home for several weeks before the murder and left on the night the victim was killed.  There is no dispute that this individual, who was later identified as Dillard, was critical to the State's ability to determine who was responsible for the murder.  Appellant does not allege deliberate or intentional delay by the State to obtain a strategic advantage at trial.  Instead, he attributes the delay to the State's negligence, claiming that the State's efforts to identify, locate, and interview Dillard were not sufficiently diligent.  However, the trial court rejected this claim, and we defer to that determination, noting that most of the investigative delay about which Appellant complains came during the period

12

when he was not facing any charges.  Compare Doggett, 505 U. S. at 652 (rejecting the government's argument that it diligently searched for the defendant where "[t]he findings of the courts below are to the contrary," explaining that "we review trial court determinations of negligence with considerable deference").  Moreover, delay due to the State's negligence typically weighs "only lightly, or benignly, against the State."  State v. Porter, 288 Ga. 524, 527 (705 SE2d 636) (2011).

The trial court properly weighed the third Barker-Doggett factor, assertion of the speedy trial right in due course, against Appellant.  He made no explicit demand for a speedy trial on the first indictment until after the court signed an order nolle prossing the case, and he then waited until five months after the return of the second indictment to file his motion to dismiss; his trial began less than two months after that.  The trial court also properly weighed the fourth factor, prejudice to the defendant, against Appellant.  He made no showing that the delay at issue weakened his ability to raise specific defenses, elicit specific testimony, or produce specific items of evidence, see Doggett, 505 U. S. at 655, and the court found against him on his allegations of "'oppressive pretrial incarceration'" and unusual "'anxiety and concern'" beyond that which

13

necessarily accompanies the pendency of serious criminal charges, id. at 654 (quoting Barker, 407 U. S. at 532).

In sum, we see no abuse of discretion by the trial court as to any of the four Barker-Doggett factors or the ultimate conclusion that Appellant's constitutional right to a speedy trial was not violated. See Brock v. State, 293 Ga. 156, 160 (743 SE2d 410) (2013). Accordingly, we reject Appellant's challenge to the trial court's order denying his motion to dismiss the second indictment.

3. Appellant next contends that the trial court erred in rejecting his challenges under Batson v. Kentucky, 476 U. S. 79 (106 SCt 1712, 90 LE2d 69) (1986), to the State's peremptory strikes of two prospective black jurors, Juror #8 and Juror #18. Batson established a three-step process for evaluating claims of racial discrimination in the use of peremptory strikes:

> (1) the opponent of a peremptory challenge must make a prima facie showing of racial discrimination; (2) the proponent of the strike must then provide a race-neutral explanation for the strike; and (3) the court must decide whether the opponent of the strike has proven [the proponent's] discriminatory intent.

Toomer v. State, 292 Ga. 49, 52 (734 SE2d 333) (2012). The jury that tried Appellant included eight black jurors, and the State used only six of its nine

14

peremptory challenges, but we will assume without deciding that Appellant made the required prima facie showing of racial discrimination at Batson step one. See Johnson v. California, 545 U. S. 162, 168-173 (125 SCt 2410, 162 LE2d 129) (2005) (discussing the requirements of a prima facie showing at Batson step one).

At Batson step two,

the proponent of the strike need only articulate a facially race-neutral reason for the strike. Step two "does not demand an explanation that is persuasive, or even plausible. 'At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.'"

Toomer, 292 Ga. at 54 (citation omitted). After Appellant made his Batson challenge, the State explained that it struck Juror #8 because she failed to raise her hand in response to any of the general voir dire questions and responded flippantly when a prosecutor questioned her about this, and it struck Juror #18 because "during a break, [he] was actually talking to one of the other [prospective] jurors and particularly about police officers." These are facially race-neutral explanations, and the State therefore satisfied its burden of production at Batson step two. See Snyder v. Louisiana, 552 U. S. 472, 477

15

(128 SCt 1203, 170 LE2d 175) (2008) (noting that "race-neutral reasons for peremptory challenges often invoke a juror's demeanor (e.g., nervousness, inattention)"); Arrington v. State, 286 Ga. 335, 340 (687 SE2d 438) (2009) (holding that body language and facial expressions may be race-neutral explanations at Batson step two); Rakestrau v. State, 278 Ga. 872, 875 (608 SE2d 216) (2005) (holding that "observed camaraderie with a fellow prospective juror" is a facially race-neutral explanation).

The first two Batson steps govern the production of evidence that leads the trial court to determine, at Batson step three, whether the opponent of the peremptory strike has carried his burden of proving purposeful discrimination. See Johnson, 545 U. S. at 171. Thus, it is at the third step of Batson that the court makes credibility determinations, evaluates the persuasiveness of the strike opponent's prima facie showing and the explanations given by the strike proponent, and examines all other "circumstances that bear upon the issue of racial animosity." Snyder, 552 U. S. at 478. See also Toomer, 292 Ga. at 55-56. After finding that the State provided facially race-neutral reasons for the strikes, the trial court here denied Appellant's Batson motion. That ultimate determination "is entitled to great deference on appeal, and Appellant has not

16

demonstrated that it was clearly erroneous." Id. at 58. Accordingly, we reject Appellant's claim that <u>Batson</u> error entitles him to a new trial.

4. Finally, Appellant argues that he should have been allowed to present evidence that Ledbetter consorted with strippers. "This Court has long held that, as a general rule, evidence of the character of a murder victim is irrelevant and inadmissible at trial." <u>Lance v. State</u>, 275 Ga. 11, 17-18 (560 SE2d 663) (2002). Notwithstanding this general rule, a criminal defendant

> is entitled to introduce relevant and admissible evidence implicating another person in the commission of the crime or crimes for which the defendant is being tried. However, the proffered evidence must raise a reasonable inference of the defendant's innocence, and must directly connect the other person with the corpus delicti, or show that the other person has recently committed a crime of the same or similar nature. "Evidence that merely casts a bare suspicion on another or 'raise[s] a conjectural inference as to the commission of the crime by another, is not admissible.'"

<u>Curry v. State</u>, 291 Ga. 446, 452-453 (729 SE2d 370) (2012) (citations omitted).

Appellant argues that Ledbetter's alleged frequent association with strippers was relevant to show that he spent his money on prostitutes instead of investing it in a hip-hop venture with Dillard that failed, giving Dillard a motive to kill him. Appellant's own explanation for why he wanted to put this evidence before the jury shows that it would have done nothing more than cast a "bare

17

suspicion" on Dillard or raise "'a conjectural inference'" that he might be the guilty party, id. (citation omitted); the evidence would not have raised a reasonable inference that Appellant was innocent or directly connected anyone else to Ledbetter's murder, see id. Moreover, Dillard and Ms. Heard testified that Ledbetter's finances were a source of friction in the household, and Dillard testified that Ledbetter was a "hustler" and a "deceiver." Under these circumstances, the trial court did not abuse its discretion in excluding this evidence. See Watson v. State, 278 Ga. 763, 770-771 (604 SE2d 804) (2004).

Judgment affirmed. All the Justices concur.

Decided July 11, 2014.

Murder. DeKalb Superior Court. Before Judge Becker.

Dell Jackson, for appellant.
Robert D. James, Jr., District Attorney, Elizabeth A. Baker, Assistant District Attorney, Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Ryan A. Kolb, Assistant Attorney General, for appellee.