308 Ga. 155
FINAL COPY

S19A1448.  HOGAN v. THE STATE.

WARREN, Justice.

Appellant Fernando Hogan appeals from his convictions for felony murder and other crimes stemming from the shooting death of Kilon Williams and the aggravated assault of Williams's friend, Nicholas Gibson.[1]  On appeal, Hogan contends only that the trial

---

[1] Williams was killed on July 3, 2014.  On January 2, 2015, a Fulton County grand jury indicted Hogan and his co-defendant, Lamontez Hinton, for the malice murder of Williams; for two counts of the felony murder of Williams, with possession of a firearm by a convicted felon and aggravated assault serving as the predicate felonies; for the armed robbery of Gibson; for the aggravated assault of Williams; for the aggravated assault of Gibson; for conspiracy to commit armed robbery against Gibson; for possession of a firearm by a convicted felon; and for the possession of a firearm during the commission of a felony.  On October 4, 2016, a jury found Hinton guilty of all counts, and Hogan not guilty of malice murder but guilty of the remaining crimes.  That same day, the trial court sentenced Hogan to life in prison for felony murder predicated on possession of a firearm by a convicted felon; a concurrent term of 20 years in prison for armed robbery; a concurrent term of 20 years in prison for the aggravated assault of Gibson; and five years on probation for the possession of a firearm during the commission of a felony.  The trial court merged the remaining counts for sentencing purposes.  Hogan filed a motion for new trial on October 26, 2016, which he amended on February 12, 2018.  On August 2, 2018, the trial court denied the motion for new trial, as amended.  The next day, the trial court amended its sentence to specify that the felony murder verdict predicated on aggravated assault was vacated by operation of

court erred by granting the State's challenge to Hogan's peremptory strikes of three prospective jurors and reseating those jurors. Upon our review of the record, we conclude that Hogan's conviction and sentence for the aggravated assault of Gibson should have been merged, and so we vacate that conviction and sentence. Finding no other reversible error, we otherwise affirm the judgment of the trial court.

1. Viewed in the light most favorable to the jury's verdicts, the evidence presented at Hogan's trial showed that, in the early morning hours of July 3, 2014, Williams and Gibson, who were going to a bar, parked their car on a side street near Ponce de Leon Avenue in Atlanta. Gibson began to walk to the bar, while Williams

---

law and to impose a concurrent 20-year sentence for the aggravated assault of Williams. See *DuBose v. State*, 299 Ga. 652, 654 (791 SE2d 9) (2016). But because the evidence shows that the aggravated assault of Gibson by pointing a gun at him (Count 6) was part of the same transaction as the armed robbery of Gibson (Count 4), the trial court should have merged Count 6 with Count 4. The conviction and 20-year concurrent sentence for Count 6 (aggravated assault of Gibson) is therefore vacated. See *Wainwright v. State*, 305 Ga. 63, 64 n.2 (823 SE2d 749) (2019); *Bradley v. State*, 292 Ga. 607, 610 (740 SE2d 100) (2013). Hogan filed a timely notice of appeal, and the case was docketed in this Court for the August 2019 term and was submitted for a decision on the briefs.

remained in the car to text someone. After Gibson had walked for about two minutes, he saw a man standing on the street apparently directing someone who was trying to park his car. But the parking job was a ruse, and the man who appeared to be directing the car pulled a gun on Gibson and told him to strip down to his underwear. Gibson did so, leaving his wallet, watch, glasses, cell phone, and clothes on the ground. The driver then got out of the car and picked up the items. The armed man told Gibson to run, and Gibson began to walk away quickly. The armed man then got into the car, and the occupants of the car drove to where Williams was parked. The armed man jumped out of the car, shot Williams several times, and got back into the car. The occupants of the car then sped off.

At trial, Gibson identified the driver as Hogan and the armed man as Hogan's co-defendant, Lamontez Hinton. Evidence was introduced that, after Gibson's phone was stolen, multiple calls were placed to a phone number belonging to Hogan's cousin, Lanquesha Washington. The evidence showed that on the morning of July 3, Hogan called Washington from a phone number that Washington

3

did not recognize. Hogan, sounding scared, told her that he and Hinton had been in an altercation, saying that they had robbed someone or had been the victims of a robbery. According to Washington, Hogan added that a shooting had occurred and that he thought someone might have died. Later in the day on July 3, Washington went to her mother's house, where Hogan lived, and talked with Hogan there. Washington saw Hogan with a black wallet that did not belong to him and overheard Hogan on the phone sounding as though he was trying to transfer money from different cards or accounts. Hogan later texted Washington, saying that he thought someone might have died, and later told her that he was watching the news and saw reports of the incident.

Hogan does not contest the legal sufficiency of the evidence supporting his convictions. Nevertheless, in accordance with this Court's general practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Hogan guilty

4

beyond a reasonable doubt of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979).

2. Hogan contends that the trial court's rejection of three of his peremptory challenges and its reseating of the affected jurors did not comply with *Georgia v. McCollum*, 505 U.S. 42 (112 SCt 2348, 120 LE2d 33) (1992). In *McCollum*, "the test announced in *Batson v. Kentucky*, 476 U.S. 79 (106 SCt 1712, 90 LE2d 69) (1986), forbidding purposeful racial discrimination in the State's use of peremptory strikes, was extended to peremptory juror challenges made by criminal defendants." *Daniels v. State*, 306 Ga. 559, 563-564 (832 SE2d 372) (2019). "When the State raises a *McCollum* objection, the trial court must engage in a three-step process to determine if the defendant's peremptory challenges were used in a racially discriminatory manner." *Edwards v. State*, 301 Ga. 822, 824-825 (804 SE2d 404) (2017). First, the State is required to "make a prima facie showing of racial discrimination"; second, "the burden of production shifts to the [defendant] to give a race-neutral reason

5

for the strike"; and third, "the trial court then decides whether the [State] has proven discriminatory intent." *Allen v. State*, 280 Ga. 678, 680 (631 SE2d 699) (2006) (citation and punctuation omitted). "Although the burden of production shifts to the defendant if the State makes a prima facie case, the ultimate burden of persuasion as to discriminatory intent rests with — and never shifts from — the State." *Edwards*, 301 Ga. at 825. "In reviewing a trial court's *McCollum* ruling, we afford deference to the trial court's findings and affirm them unless they are clearly erroneous." *Dunn v. State*, 304 Ga. 647, 649 (821 SE2d 354) (2018) (citation and punctuation omitted).

As a preliminary matter, we observe that the individual questioning of prospective jurors was not transcribed, but the State's *McCollum* challenge and the ensuing discussions involving the State, defense counsel, and the trial court were transcribed. Our review is necessarily "limited to the portions of voir dire that were transcribed." *Nwakanma v. State*, 296 Ga. 493, 500 (768 SE2d 503) (2015), disapproved of on other grounds by *Willis v. State*, 304 Ga.

6

686, 706 n.3 (820 SE2d 640) (2018).[2]

Hogan makes two specific arguments on appeal: (a) that the trial court erroneously combined the second and third steps of the *McCollum* analysis with respect to Juror 11, and (b) that the trial court erroneously found that the State had proved discriminatory intent as to the three reseated jurors. We conclude that the trial court did not err in either of these ways.

(a) The trial court did not improperly combine the second and third steps of the *McCollum* analysis when considering Hogan's peremptory challenge to Juror 11. During voir dire, when the State raised its *McCollum* objection, the parties agreed that, before any peremptory strikes were exercised, white prospective jurors made up 50% of the initial jury venire and approximately 47% of the

---

[2] We note that although the individual questioning of prospective jurors was not transcribed, the record on appeal shows that Hogan made no objection to the "manner in which the trial court placed the venire composition and juror background information on the record. Moreover, no assertion has been made, either in the trial court or on appeal, that the information set forth by the trial court was incorrect." *Rose v. State*, 287 Ga. 238, 239 n.2 (695 SE2d 261) (2010). And there is no dispute about the race of the prospective jurors or about the substance of individual voir dire.

7

eventual jury pool from which the strikes were made, but that the defendants—who had combined their peremptory strikes — used all nine of their peremptory strikes for jury members and their two peremptory strikes for alternate jurors on white prospective jurors. Given that the State only needed to produce evidence sufficient to allow the trial court to infer "that discrimination ha[d] occurred, the trial court did not err by concluding that a prima facie case of purposeful discrimination was established where [the defendants] used 100 percent of [their] peremptory strikes against white venirepersons." *Rose v. State*, 287 Ga. 238, 239-240 (695 SE2d 261) (2010) (citation and punctuation omitted). With the first step of the *McCollum* inquiry satisfied, the trial court then reached the second step, requiring the defendants to articulate the reasons for each of their peremptory strikes, beginning with Juror 11.[3] Hogan's counsel explained that Juror 11 was "the foreperson on several criminal

---

[3] The trial court required explanations for all nine of the defendants' peremptory strikes for jury members, and the State took issue with the explanations for each. But the trial court upheld the State's *McCollum* challenge only as to Jurors 11, 22, and 29.

8

trials"; that she "lives in Alpharetta, . . . far outside the perimeter, a predominantly overwhelming white community, historically more of a white-flight community because they don't want to live in the city"; that there was "a concern about her hardship"; and that "her husband had been a CEO of several companies that socioeconomically [were] very elite." Hinton's counsel added that Juror 11's service on juries in the past was discussed; that her "living in Alpharetta brings up flags for us, whether or not she can actually relate to the goings on of the inner city"; and that her mother was 91 years old and had a broken ankle.

Before the prosecutor could respond to the defendants' proffered reasons, the trial court interjected: "You don't need to. I'll tell you that a number of the proffered explanations are proxies for race, Alpharetta being where white people live, upper socioeconomic strata, being able to relate to the urban setting." The trial court added that it also "heard two race-neutral reasons given for striking" Juror 11: her prior service as a foreperson, and her elderly mother — "not so much because she wouldn't get cared for but because

9

[Juror 11] would be imposing on so many others." The prosecutor then responded that, with regard to Juror 11 being a foreperson, defense counsel did not "know what the outcome of those trials were" and that "it's just a pretext . . . to get around the other reasons that they named, which were generally that she was historically white flight, Alpharetta is a historically white neighborhood, when they did not ask her about those things," as well as "being social elitists, whatever the terminology was she used." The court stated that these reasons were not sufficient justifications because they struck the court as "either . . . not so race neutral or facially race based." And the court characterized defense counsel's concerns about Juror 11 previously serving as a foreperson and having a sick mother as "race neutral unless you've got a juror who's similarly situated." The prosecutor then pointed out that another juror had sat on several juries and had served as the foreperson for a federal criminal trial, but was not struck from the jury here.

The trial court reseated Juror 11, ruling that the strike was because "she is just from Alpharetta and that is not enough"; that

10

the hardship related to her mother did not distinguish her from the professed hardships of other jurors; that the residence of Juror 11 and two other jurors should not be assumed to make them unable to process the evidence "dispassionately" and "in the same manner as" certain jurors who had not been struck; and that the argument about Juror 11's socioeconomic circumstances "rings a little bit hollow and I think it got too close to the line of it was race based" in light of the "particularly compelling" fact that one juror who was not struck was "an African American from Roswell" and another juror who was not struck was "an African American from Sandy Springs whose husband [works] at Goldman Sachs."

Hogan argues that the trial court accepted his explanation for striking Juror 11 as facially race-neutral at the second step of the *McCollum* analysis, but then prematurely reached the third step by evaluating the persuasiveness of the explanation and immediately concluding that it was pretextual without first hearing argument from the State and shifting the burden back to the State to prove that the strike was made with discriminatory intent.

11

Here, the voir dire transcripts show that the trial court was not entirely clear as to whether it thought Juror 11's residence and socioeconomic circumstances were facially race-neutral reasons for the defense's peremptory strike. And although the trial court never expressly stated that it was "moving to step three of the *McCollum* analysis, we do not look merely at the nomenclature used during a colloquy, but at the totality of the discussion, including the trial court's inquiry. We don't read statements in isolation; we read them in context." *Dunn*, 304 Ga. at 651 (citation and punctuation omitted). So viewed, the transcripts show that the court requested a response from the prosecutor after defense counsel gave reasons for the peremptory strike of Juror 11, "implicitly indicating it was moving to step three," and its initial comment that "[y]ou don't need to" respond was only an initial reaction and did not in fact preclude the prosecutor's response. *Edwards*, 301 Ga. at 825. Indeed, the prosecutor responded to the trial court's request — as would be expected at the third step of the *McCollum* analysis — discussing

12

with the court whether the defense was using a "pretext"[4] and pointing out evidence of discriminatory intent. Moreover, the trial court's ultimate ruling addressed these issues, thus satisfying the third step in the *McCollum* analysis.

It is true that the trial court incorrectly used the term "race neutral" (a concept applicable to the second step of the analysis) in determining whether the strike of Juror 11 was made with discriminatory intent (the third step of the analysis), saying that the reasons other than Juror 11's residence were "race neutral unless you've got a juror who's similarly situated."[5] But the use of the term

---

[4] Unlike the question of whether a stated reason for a peremptory strike was race-neutral, the question of whether the reason was "pretextual" is properly considered at the third step of a *Batson* inquiry. See *Flowers v. Mississippi*, ___ U.S. ___, ___ (139 SCt 2228, 2241, 204 LE2d 638) (2019) (after race-neutral reasons for peremptory strikes are provided, "[t]he trial judge must determine whether the . . . stated reasons were the actual reasons or instead were a pretext for discrimination"); *Snyder v. Louisiana*, 552 U.S. 472, 485 (128 SCt 1203, 170 LE2d 175) (2008) (at the third stage of the *Batson* inquiry, the proffer of a "pretextual explanation naturally gives rise to an inference of discriminatory intent"); *Toomer v. State*, 292 Ga. 49, 55 (734 SE2d 333) (2012) (quoting *Snyder*). The same is true for a *McCollum* inquiry because, as explained above in Division 2, *McCollum* extended the *Batson* test to peremptory strikes exercised by criminal defendants. See *Daniels*, 306 Ga. at 563-564.

[5] Factors that a judge may consider in evaluating whether there was

"race neutral" cannot be read in isolation and is not dispositive of whether the trial court properly conducted the *McCollum* analysis. *Dunn*, 304 Ga. at 651 (explaining that the trial court's use "of the term 'race neutral' in the discussion of whether [defense counsel's] stated reason for the strike was pretextual is not dispositive" of whether the trial court failed to consider step three of the *McCollum* test); see also *Daniels*, 306 Ga. at 565 (notwithstanding the trial court's statements that one peremptory strike was a "racial strike" and that the reasons for another were not "race neutral," the court "nonetheless reached the third step of the *McCollum* inquiry and concluded that the defense had acted with discriminatory intent in striking the two jurors").[6]

We therefore conclude that, based on the circumstances of this case and viewing the record as a whole, where the record shows that

discriminatory intent in the use of peremptory strikes include "comparisons of jurors who were struck and jurors of a different race who were not struck." *Daniels*, 306 Ga. at 566 (citing *Flowers*, ___ U.S. at ___ (139 SCt at 2243)).

[6] Hogan's reliance on *Jackson v. State*, 265 Ga. 897, 899 (463 SE2d 699) (1995), is misplaced; in that case, "the trial court rejected the defendant's reasons at the second step and terminated further inquiry." *Edwards*, 301 Ga. at 826.

the trial court heard the prosecutor's argument about discriminatory intent, discussed how other jurors of a different race who were similarly situated to Juror 11 were not stricken, and concluded that the defense had acted with discriminatory intent, the trial court adequately conducted all three steps of the *McCollum* analysis and did not conflate the second and the third steps. Hogan's argument therefore fails.

(b) The trial court did not clearly err in its finding of discriminatory intent as to Hogan's peremptory challenges of the three jurors — Jurors 11, 22, and 29 — who then were reseated. Having already recounted in Division 2 (a) the defendants' explanations, the prosecutor's responses, and the trial court's reasoning with respect to Juror 11, we turn to Jurors 22 and 29. With regard to Juror 22, the only reason Hogan's counsel gave for striking her was that "she lives in Alpharetta. She was certainly somebody that was on the cusp. I saw some things that I liked about her. We talked about it and it's a primary location, differential between her and some of the other jurors that we looked at." In

arguing that Hogan's strike was discriminatory, the prosecutor stated, "with regard to location, it's the same," suggesting that Hogan's counsel had stricken Juror 22 for one of the same reasons he had stricken Juror 11, and noted the defendants' failure to strike an African-American juror who resided in Sandy Springs, "north of the perimeter." Hinton's counsel then responded that Sandy Springs was "a completely different community with a lot of apartments and a lot of mixed income folks compared to . . . Alpharetta" and that "Sandy Springs actually has MARTA flowing right into their city." Hogan's counsel added that "we're not using the strikes because they are white people[;] we just think that they would be less good jurors than other selections that we have." The trial court stated, "That's a fair point. The question is: why did you conclude they would be less good? And I need to be comfortable that your basis for concluding they would be less good was something other than race." The trial court reseated Juror 22 because Hogan's only reason for striking her was that she was from Alpharetta, which Hogan's counsel had described as a "white" community.

16

As for Juror 29, Hogan's counsel explained that she was struck because she was from Alpharetta and because "her oldest daughter was sexually assaulted four years ago." The prosecutor responded that two other jurors who were not struck had close relatives who had been murdered.[7] The court reseated Juror 29 because, although her daughter had been sexually assaulted, when the court compared "that one dimension about someone close to her being a victim of a crime" with other potential jurors who had experienced "actual deaths, murders," and were not struck, "again we're back to Alpharetta, a proxy for race."

Here, even assuming — without deciding — that under some set of circumstances, the socioeconomic condition of a juror's predominantly single-race community can serve as a facially race-neutral reason for a jury strike, the trial court still "must ultimately decide the *credibility* of such [an] explanation." *Rose v. State*, 287

---

[7] Although the race of those two jurors with close relatives who had been murdered is not obvious from the record, Hogan has not challenged the prosecutor's argument or the trial court's findings on that basis. See *Daniels*, 306 Ga. at 566 & n.9.

Ga. at 241 (citation and punctuation omitted; emphasis in original). "There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge." *Miller-El v. Cockrell*, 537 U.S. 322, 339 (123 SCt 1029, 154 LE2d 931) (2003) (quoting *Hernandez v. New York*, 500 U.S. 352, 365 (111 SCt 1859, 114 LE2d 395) (1991)). And evaluation of the state of mind of the proponent of a strike "based on demeanor and credibility lies peculiarly within a trial judge's province." *Hernandez*, 500 U.S. at 365 (citation and punctuation omitted). The opponent of a strike "may carry its burden of persuasion by reference to the facts and circumstances surrounding the proponent's use of its peremptory strikes," and the trial court "in most cases must infer discriminatory intent from circumstantial evidence." *Allen*, 280 Ga. at 681 (citations and punctuation omitted). As the United States Supreme Court explained just last year, the types of evidence that may be presented to support a claim that peremptory strikes impermissibly were made on the basis of race include, among other things, statistical evidence about the

proponent's use of peremptory strikes against prospective jurors of one race as compared to prospective jurors of a different race in the case; disparate questioning of prospective jurors of different races; and side-by-side comparisons of prospective jurors who were struck and jurors of a different race who were not struck.  See *Flowers v. Mississippi*, ___ U.S. ___, ___ (139 SCt 2228, 2243, 204 LE2d 638) (2019).

Here, the circumstances surrounding Hogan's use of peremptory strikes support the trial court's determination that residence in Alpharetta was a pretext for racial discrimination. First, defense counsel's initial identification of Alpharetta as "a predominantly overwhelming white community, historically more of a white-flight community" supports the trial court's finding that Alpharetta was used as a proxy for race.  See *Russell v. State*, 230 Ga. App. 546, 548 (497 SE2d 36) (1998) (where defense asserted that one white female juror was stricken because she had been the victim of a similar crime and also "lived in Dunwoody which allegedly is 'notorious for not having a lot of black people living there,'" the State

19

met its burden of showing that the defense's proffered explanation was a pretext for discrimination because the defense had accepted a similarly situated black juror who had also been the victim of a similar crime).  Indeed, this Court has expressed concern about peremptory challenges based on "[m]ere place of residence, or any other factor closely related to race." *Congdon v. State*, 262 Ga. 683, 685 (424 SE2d 630) (1993) (citation and punctuation omitted).  But cf. *King v. State*, 273 Ga. 258, 269 (539 SE2d 783) (2000) (quoting *Congdon* but accepting State's explanation for why it struck a juror who lived in the same neighborhood as defendant's family members because the juror at issue "was shown to have specific personal acquaintances that might have tended to make her sympathetic to the [opponent of the peremptory strike]").  Although we have clarified that the second step of the *Batson* analysis "does not demand an explanation [for a peremptory strike] that is [case-related], persuasive, or even plausible," reasons that are not case-related, persuasive, or plausible may be "found to be pretexts for purposeful discrimination" at the third step of the *Batson* (and thus

20

*McCollum*) analysis. *Toomer v. State*, 292 Ga. 49, 54-55 (734 SE2d 333) (2012) (citations and punctuation omitted). Thus, even assuming that identification of the jurors' residence as a "white-flight" community is a facially race-neutral reason at the second step of the *McCollum* inquiry, the trial court was authorized to consider the close relationship of that reason to race at the third step of the inquiry to conclude that it was unpersuasive or implausible in light of all of the relevant circumstances.

Second, the statistical evidence shows that the defendants used all nine of their peremptory strikes against white prospective jurors even though those jurors made up only half of the initial jury venire and less than half of the eventual jury pool from which the strikes were made. See *Flowers*, ___ U.S. at ___ (139 SCt at 2243, 2246). Under the circumstances presented here, the trial court was authorized to conclude that such a strong prima facie case of discrimination diminished the persuasiveness of Hogan's proffered explanation that Alpharetta was not being used as a proxy for race. *Allen*, 280 Ga. at 682.

21

Third, although the record does not reveal disparate questioning of prospective jurors of different races, Hogan's apparent failure to question potential jurors during voir dire nonetheless supported "'an inference of discriminatory purpose.'" *Flowers*, ___ U.S. at ___ (139 SCt at 2246) (quoting *Batson*, 476 U.S. at 97). Specifically, the transcripts in the appellate record suggest that Hogan's counsel "fail[ed] to engage in any meaningful voir dire examination" of certain white jurors, thus "suggesting that the explanation [for the peremptory strike] is a sham and pretext for discrimination." Id. at ___ (139 SCt at 2249). For example, the transcripts show that the prosecutor complained about a lack of voir dire about the stricken jurors' residence, and Hogan concedes on appeal that he did not question the stricken jurors about the effect of their residence and socioeconomic status on their ability to decide the case fairly and impartially. Given this lack of questioning, the trial court was authorized to infer a discriminatory purpose in Hogan's use of peremptory strikes.

Finally, a comparison of "prospective jurors who were struck

22

and not struck" supports the trial court's ruling that residence in Alpharetta was a pretext for race. See *Flowers*, ___ U.S. at ___ (139 SCt at 2248). In this regard, Hogan's primary argument on appeal is that the trial court should not have compared jurors living in Alpharetta with jurors living in Roswell and Sandy Springs because those jurors were not similarly situated in light of the significant "socioeconomic differences" between their cities and Alpharetta. But the prosecutor was "not required to identify an *identical . . .* juror [of a different race] for the side-by-side comparison to be suggestive of discriminatory intent," id. at ___ (139 SCt at 2249) (emphasis in original), and Hogan's attempts on appeal to explain the socioeconomic differences between Alpharetta and the other cities at issue—for example, by invoking the availability of public transportation in Sandy Springs, his own personal experience, and (for the first time on appeal) Census data — are unavailing.[8] The

---

[8] In particular, Hogan's trial counsel's general observations about people and locations in and around Atlanta were quintessential examples of statements to which a trial court's evaluation of counsel's demeanor and credibility is particularly relevant. See *Hernandez*, 500 U.S. at 365.

transcript shows that the trial court grappled with differences between jurors who were stricken and those who were not, expressing that the differences in city of residence, expected hardship of jury service, and past experience of close relatives with crime were not significant with respect to the jurors who ultimately were reseated, even while relying on differences with respect to other jurors who had been stricken. The trial court's consideration of similar prospective jurors who had not been stricken provides additional circumstantial support for its inference of a discriminatory purpose. See *Russell*, 230 Ga. App. at 548.

Having considered the facts and circumstances surrounding the strikes of Jurors 11, 22, and 29, we conclude that the trial court had a sufficient basis to reject Hogan's peremptory challenges, and to reseat those jurors for his trial, and that its findings in this regard were not clearly erroneous.

*Judgment affirmed in part and vacated in part. All the Justices concur.*

24

DECIDED FEBRUARY 28, 2020.
Murder. Fulton Superior Court. Before Judge McBurney.
*Margaret E. Bullard*, for appellant.
*Paul L. Howard, Jr., District Attorney, Lyndsey H. Rudder, Stephany J. Luttrell, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Leslie*

*A. Coots, Assistant Attorney General*, for appellee.