314 Ga. 21
FINAL COPY

S22A0254.  BYRD v. THE STATE.

WARREN, Justice.

After a jury trial, Andre Juvell Byrd was convicted of malice murder and other crimes in connection with the shooting death of David McReynolds.[1]  On appeal, Byrd contends only that the trial court erred by granting the State's challenge to his peremptory strikes of three prospective jurors and by reseating those jurors.  We affirm the judgment of the trial court.

---

[1] On January 11, 2013, a Fulton County grand jury indicted Byrd, Dedrick Hale, and Quinterious Hogans for malice murder, felony murder predicated on aggravated assault, felony murder predicated on criminal attempt to commit armed robbery, aggravated assault, criminal attempt to commit armed robbery, and possession of a firearm during the commission of a felony.  Byrd was tried separately from August 4 to 7, 2015, and the jury found him guilty on all six counts.  The trial court sentenced Byrd to serve life in prison for malice murder, a suspended concurrent term of ten years for attempted armed robbery, and a consecutive term of five years for the firearm offense.  The felony murder counts were vacated by operation of law, and the aggravated assault count merged for sentencing purposes.  Through trial counsel, Byrd filed a timely motion for new trial, which was amended through new counsel.  After a hearing, the trial court denied Byrd's amended motion on August 6, 2021.  Byrd filed a notice of appeal on August 17, 2021, which he amended on September 23, 2021.  The case was docketed in this Court to the term beginning in December 2021 and orally argued on February 17, 2022.

1. The evidence presented at Byrd's trial showed the following. McReynolds, a disabled veteran well known in the Grant Park community, left a local corner store after buying lottery tickets. Byrd, Dedrick Hale, and Quinterious Hogans followed McReynolds and, when McReynolds was alone, demanded that he hand over any money he had. When one of the men thought McReynolds took too long to hand over the money, he shot McReynolds in the chest with a .38-caliber pistol. The three men fled the scene, and McReynolds died before paramedics arrived.

Surveillance video footage of Byrd following McReynolds from the corner store—which was also corroborated by eyewitness testimony—led to Byrd's arrest. The same eyewitness identified Byrd in a lineup as one member of the group of men who shot McReynolds, and Byrd ultimately incriminated himself by recounting the events surrounding McReynolds's murder to a detective in a custodial interview in which Byrd sought to cast blame on his co-indictees.

2. During jury selection for Byrd's trial, he exercised seven of

his eight peremptory strikes against white jurors, including strikes against Jurors 3, 5, 19, and 24. The State objected to Byrd's use of peremptory strikes under *Georgia v. McCollum*, 505 U.S. 42 (112 SCt 2348, 120 LE2d 33) (1992). The trial court ultimately agreed with the State as to four of Byrd's peremptory strikes and reseated Jurors 5, 19, and 24.[2] Byrd's sole enumeration of error on appeal is that the trial court's rejection of three of his peremptory challenges and its reseating of those jurors did not comply with *McCollum*. As explained below, we conclude that the trial court conducted all three prongs of the *McCollum* test before reseating Jurors 5, 19, and 24.

(a) In *McCollum*, "the test announced in *Batson v. Kentucky*, 476 U.S. 79 (106 SCt 1712, 90 LE2d 69) (1986), forbidding purposeful racial discrimination in the State's use of peremptory strikes, was extended to peremptory juror challenges made by criminal defendants." *Daniels v. State*, 306 Ga. 559, 563-564 (832 SE2d 372) (2019). "When the State raises a *McCollum* objection, the

---

[2] The trial court also reseated Juror 3. Byrd acquiesced to the reseating of Juror 3 at trial, and he does not challenge the reseating of Juror 3 on appeal.

3

trial court must engage in a three-step process to determine if the defendant's peremptory challenges were used in a racially discriminatory manner." *Edwards v. State*, 301 Ga. 822, 824-825 (804 SE2d 404) (2017).

First, the State is required to "make a prima facie showing of racial discrimination." *Allen v. State*, 280 Ga. 678, 680 (631 SE2d 699) (2006) (citation and punctuation omitted). Second, "the burden of production shifts to the proponent of the strike to give a race-neutral reason for the strike." Id. (citation and punctuation omitted). At step two, "the proponent of the strike need only articulate a facially race-neutral reason for the strike." *Toomer v. State*, 292 Ga. 49, 54 (734 SE2d 333) (2012). Step two "does not demand an explanation that is persuasive, or even plausible." Id. (citation and punctuation omitted). Nor does step two require the race-neutral explanation to be "case-related" or "specific." Id. Third, "the trial court . . . decides whether the opponent of the strike has proven discriminatory intent." *Allen*, 280 Ga. at 680 (citation and punctuation omitted). At step three, the trial court must "decide

4

whether the opponent of the strike has proven the proponent's discriminatory intent in light of 'all the circumstances that bear upon the issue of racial animosity.'" *Toomer*, 292 Ga. at 55 (quoting *Snyder v. Louisiana*, 552 U.S. 472, 478 (128 SCt 1203, 170 LE2d 175) (2008)). Those circumstances may include "an evaluation of the credibility of the strike's proponent, which in turn may depend on the specificity and case-relatedness of the explanation for the strike given at step two." *Toomer*, 292 Ga. at 55. "Although the burden of production shifts to the defendant if the State makes a prima facie case, the ultimate burden of persuasion as to discriminatory intent rests with—and never shifts from—the State." *Edwards*, 301 Ga. at 825. "In reviewing a trial court's *McCollum* ruling, we afford deference to the trial court's findings and affirm them unless they are clearly erroneous." *Dunn v. State*, 304 Ga. 647, 649 (821 SE2d 354) (2018) (citation and punctuation omitted).

(b) The background relevant to jury selection at trial is as follows. After Byrd used seven of his eight peremptory strikes on white jurors and the State objected under *McCollum*, the trial court

5

found that the State made a prima facie case of racial discrimination.[3] Byrd's counsel responded that he would "give [the trial court] . . . race neutral reasons" for exercising his peremptory strikes. Counsel asserted that Juror 5 had been a robbery victim and had previously served as a juror in a criminal burglary case. Counsel asserted that Juror 19 was "a lawyer at King and Spalding which is a large law firm" that "potentially tends to go right of center," and contended that Juror 19 would thus "lean conservative." When the trial court responded that Juror 19 was "a director of recruiting, which is different," counsel responded: "Big law firm." Finally,

---

[3] Byrd used 87.5% of his peremptory strikes (7 of 8) on white prospective jurors, and 1 of his 8 peremptory strikes on a black juror. When the State raised its *McCollum* objection, the parties agreed that, before any peremptory strikes were exercised, there were 19 white prospective jurors, 9 black jurors, 1 juror who identified as Hispanic, and 1 juror who self-identified as "other." The voir dire transcript evinces much confusion about whether to also include 3 alternate prospective jurors in calculations about the percentage of each race represented in the pool of potential jurors. Nonetheless, the transcript shows that the parties and the trial judge discussed the race of the jurors Byrd struck via peremptory strike and the overall racial makeup of the jury pool, and that the trial court concluded that the State made a prima facie case of racial discrimination under step one of the *McCollum* framework. Byrd does not challenge on appeal the trial court's step-one finding, which, given our conclusions regarding step two of the *McCollum* analysis below, is moot in any event. See *Johnson v. State*, 302 Ga. 774, 779 (809 SE2d 769) (2018).

6

counsel explained that Juror 24 was a dentist and a small-business owner, and contended that "being self-employed, a dentist, tends to be more conservative, tends to lean more towards the State."[4] Byrd's counsel then concluded, "those are my race neutral reasons."

The prosecutor first responded by stating that "none of these jurors were really even asked questions by the defense." He further responded that "just because someone's been a juror before on a case and reached a verdict" when "we don't even know what that verdict was" is not "a legitimate reason to strike somebody"; read in context, this appears to have applied to both Juror 3 (whose reseating is not challenged on appeal) and Juror 5. The prosecutor then expressed the "most concern" with the assertion that "Juror . . . 24 is a dentist and they tend to be conservative," arguing that counsel's stated reason for the strike amounted to "characterizing and stereotyping that person based on characteristics that are apparent from the juror" and "that's an impermissible purpose to strike somebody."

_____

[4] Byrd's trial counsel also offered race-neutral reasons for striking Jurors 3, 7, 9, 13, and 32. The trial court accepted the reasons for striking Jurors 7, 9, 13, and 32, and those jurors were not reseated.

7

Byrd's counsel stated that his reason for striking Juror 24 was race-neutral because "dentists are not a particular protected class nor are small business owners," that striking Juror 24 based on his occupation would "not [be] based on race," and that the trial court does "not go behind the explanations as long as the attorney gives a race neutral basis."

After some additional discussion about jurors who were not reseated or whose reseating is not challenged on appeal, the trial court said:

> Well, I'm trying to wade my way through this. This is never clear, but I'm analyzing your — looking at your race neutral — your — what you're claiming to be race neutral. And out of the seven, I find just looking at them all — and that's another way that I understand I can do this — and I find that four of them I don't find them to be race neutral. I don't find you to have a reason that's related to the case. And I can't imagine that you had any other basis for them based upon review of my notes and all and then what you stated as your reasons.

The trial court then stated that "out of your seven strikes, I've got four that I don't accept your race neutral reasons for" and "three that I do accept your race neutral reasons for." Specifically, the court

8

rejected the race-neutral reasons Byrd's counsel offered for striking

Jurors 3, 5, 19, and 24.

The trial court continued:

> All I can do is go over my notes . . . and what I have in my classes and everything else. And one of the things is . . . it's got to relate to the case to be tried. It's got to be legitimate. It's got to be clear and reasonably specific and evaluated in the light of other explanations. So what I do is once I find a prima facie case, I have to look at if there's some sort of pattern there. And the only way that I can try to rationally start looking at a pattern is kind of start seeing, you know, what I accept. I accept your race neutral on some of these folks. But on other folks, I don't think there is a race neutral reason. You can give any reason. And so I'm supposed to look at this and try to divine whether you're trying . . . whether you had a legitimate reason or perhaps it was more the race than otherwise.

(c)    On appeal, Byrd argues that the trial court erred because it did not perform a correct step-two analysis under *McCollum* and never performed a step-three analysis before concluding that Jurors 5, 19, and 24 were improperly stricken and reseating them.[5]

---

[5] Byrd does not meaningfully challenge the trial court's finding that his counsel acted with discriminatory intent in striking Jurors 5, 19, and 24—a factual and credibility finding that is generally afforded great deference on appeal.  See *Rose v. State*, 287 Ga. 238, 241 (695 SE2d 261) (2010) (explaining that the trial court still "must ultimately decide the *credibility* of such [an]

Specifically, Byrd argues that "the trial judge both remained in, and misunderstood," step two of *McCollum*, and that the court never moved to step three—implicitly or otherwise—because it evaluated counsel's race-neutral reasons using considerations (such as case-relatedness, legitimacy, clarity, and specificity) that Byrd characterizes as "quintessential" step-two factors.

To be sure, neither Byrd, nor the State, nor the trial court expressly indicated when the analysis progressed from step two to step three. However, "we do not look merely at the nomenclature used during a colloquy, but at the totality of the discussion, including the trial court's inquiry. We do [not] read statements in isolation; we read them in context." *Hogan v. State*, 308 Ga. 155, 160 (839 SE2d 651) (2020) (citation and punctuation omitted). So viewed, the record shows that the trial court considered the correct

explanation") (citation and punctuation omitted; emphasis in original). Indeed, Byrd contends that the trial court's "use of an incorrect legal standard" and its failure to properly conduct the *McCollum* inquiry was a "purely legal error" that should be reviewed de novo and that "requires reversal of [his] convictions." Byrd appears to disavow any claim on appeal that would employ a "clearly erroneous" standard of review.

10

standard at *McCollum* step two, and that it also engaged in a step-three analysis.

With respect to step two, Byrd argues that the trial court applied the wrong standard because it mentioned looking for "patterns" of wrongful strikes and suggested that race-neutral reasons needed to be "relate[d] to the case," "legitimate," and "clear and reasonably specific and evaluated in light of other explanations." According to Byrd, any consideration of a "pattern" of strikes relates to step one and not step two. And the "relate[d] to the case," "legitimate," and "clear and reasonably specific" considerations are found in cases that Byrd says *Toomer* overruled. See *Toomer*, 292 Ga. at 54.[6] In short, Byrd contends that the trial

---

[6] Byrd mischaracterizes *Toomer*'s effect on those cases, which include *Veasey v. State*, 311 Ga. App. 762, 766 n.11 (717 SE2d 284) (2011) (holding that a step-two explanation must be not only race-neutral but also concrete, tangible, case-related, and neutrally applied); *Parker v. State*, 219 Ga. App. 361, 364 (464 SE2d 910) (1995) (same); *Blair v. State*, 267 Ga. 166, 167 (476 SE2d 263) (1996) (providing that a step-two race-neutral explanation must be case-related and specific); and *Turner v. State*, 267 Ga. 149 (476 SE2d 252) (1996) (same). Rather than wholly overruling those cases, *Toomer* disapproved them to the extent they suggested that a proponent of a peremptory strike is *required* to offer an explanation for the strike beyond an explanation that is facially race-neutral. We further held in *Toomer* that although these

11

court was "unfamiliar with . . . and misapplied[ ] the governing law" at step two, including because the court "made remarks going well past the question of race-neutrality," and contends that error requires reversal.

But the voir dire transcript undermines Byrd's claim, because it shows that after the trial court found that the State had made a prima facie case of racial discrimination, the burden of production shifted to Byrd "to give a race-neutral reason for [each] strike," *Allen*, 280 Ga. at 680 (citation and punctuation omitted); that Byrd's counsel told the trial court, "I will give you my race neutral reasons"; and that counsel offered race-neutral reasons to support the peremptory strikes he had made, including for Jurors 5, 19, and 24. As recounted above, those reasons included assertions that those three jurors had, among other things, previously served as a juror, worked at a large law firm that counsel characterized as "potentially . . . right of center," and owned a small business, which counsel

considerations are not required by step two, they may be considered as part of the trial court's inquiry at step three. See *Toomer*, 292 Ga. at 54.

12

characterized as "tend[ing] to be more conservative." Especially given that step two requires only that the "explanation for the strike . . . be facially race-neutral," *Toomer*, 292 Ga. at 54, we conclude that the record shows that the trial court allowed Byrd to meet his burden of production at step two, and that Byrd did so. With respect to Byrd's argument that the trial court failed to move to or engage in a step-three analysis, Byrd contends that his argument is not that "the court failed clearly to announce its progress from step to step," but instead that "the record reveals no inquiry into intentional discrimination at all"—especially with respect to Jurors 5, 19, and 24.

But the voir dire transcript again shows otherwise. Indeed, the record contains multiple indications that the trial court engaged in a step-three analysis and "evaluat[ed] the credibility of the strike's proponent." *Toomer*, 292 Ga. at 55. To begin, the trial court allowed the State to respond to Byrd's proffered race-neutral reasons and listened to—and at times participated in—an exchange between the parties about the *McCollum* challenges to the relevant jurors. See

*Hogan*, 308 Ga. at 160 (holding that even where a trial court initially prevented the prosecutor from responding to a defendant's proffered race-neutral reasons, and concluded at that time that "a number of the proffered explanations are proxies for race," but later "requested a response from the prosecutor," the court "implicitly indicat[ed] it was moving to step three"). See also *Dunn*, 304 Ga. at 651 ("Viewed in context, it is apparent that the trial court . . . moved beyond the step two determination of neutrality, heard the prosecutor's and defense counsel's arguments with regard to [the proponent's] explanation, and concluded that the explanation was pretextual and made with discriminatory intent."). Regarding Juror 5, whom Byrd said he struck because he previously served on a jury, the State suggested that the strike was pretextual because "none of these jurors were really even asked questions by the defense," and that "just because someone's been a juror before on a case and reached a verdict, we don't even know what that verdict was." Regarding Juror 19, whom Byrd said he struck because she worked as a lawyer at a large law firm that could be considered "right of center," the

14

trial court interrupted counsel's explanation to clarify that the juror was the "director of recruiting, which is different." And regarding Juror 24, whom Byrd struck for being a dentist and a small-business owner, and whom counsel characterized as "tends to be more conservative, tends to lean more towards the State," the prosecutor argued that Byrd's reason was impermissible "stereotyping . . . based on characteristics that are apparent from the juror," implying that the real reason for the strike was based on race.

The transcript shows that the trial court considered the race-neutral reasons counsel offered, considered the arguments that followed, and acknowledged that it was "supposed to look at this and try to divine whether [Byrd] . . . had a legitimate reason or perhaps it was more the race than otherwise." In other words, the trial court expressed that in evaluating Byrd's race-neutral reasons for striking jurors, it was authorized to consider whether those reasons were merely pretextual. In doing so, the trial court considered whether the reasons Byrd provided were credible "in light of all the circumstances that bear upon the issue of racial animosity."

15

*Toomer*, 292 Ga. at 55 (citation and punctuation omitted).

The record shows that is what the trial court in fact concluded with respect to Jurors 5, 19, and 24. A number of findings support that conclusion. For example, the trial court specifically pointed out (much like the State did earlier in voir dire) that Byrd's counsel did not question the prospective jurors, which can support an inference of purposeful discrimination. See *Hogan*, 308 Ga. at 164. Additionally, the trial court expressed its belief that Byrd's counsel did not provide a reason for the peremptory strikes "related to the case," which—as we explained above in footnote 6—is a factor that we have said courts may consider as part of step three. See *Toomer*, 292 Ga. at 55 (explaining that specificity and case-relatedness are not required to be considered at step two, but may be considered as part of a step-three analysis). Finally, the trial court expressly stated that it was "analyzing" the race-neutral reasons Byrd offered and that it "c[ould] n[ot] imagine that [Byrd] had any other basis for them based upon review of my notes and all and then what you stated as your reasons." The court concluded: "I find that four of

16

[the strikes] I don't find them to be race neutral." Although the trial court, after listening to the prosecutor's responses to Byrd's race-neutral reasons, stated at one point that it did not find Byrd's counsel's explanations to be "race neutral"—a term typically associated with step two—that statement "cannot be read in isolation and is not dispositive of whether the trial court properly conducted the *McCollum* analysis." *Hogan*, 308 Ga. at 160-161. See also *Dunn*, 304 Ga. at 651 ("The use by the State and the trial court, as well as defense counsel, of the term 'race-neutral' in the discussion of whether Dunn's stated reason for the strike was pretextual is not dispositive.").

We therefore conclude that, based on Byrd's arguments on appeal and the circumstances of this case, and viewing the record as a whole, the record shows that the trial court allowed Byrd's counsel to offer race-neutral reasons for each of his peremptory strikes; afforded the prosecutor the opportunity to respond to counsel's race-neutral reasons for making the challenged strikes; engaged with the parties and analyzed their arguments; rejected Byrd's asserted race-

17

neutral reasons for striking Jurors 5, 19, and 24; and reseated those jurors. We thus conclude that step two was conducted, and that the trial court implicitly moved to step three and satisfied *McCollum*'s three-pronged test. Byrd's enumeration of error therefore fails.

*Judgment affirmed. All the Justices concur.*

Decided June 22, 2022.

Murder. Fulton Superior Court. Before Judge Cox.

*Stephen R. Scarborough*, for appellant.

*Fani T. Willis, District Attorney, Lyndsey H. Rudder, Mathew E. Plott, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Kathleen L. McCanless, Matthew B. Crowder, Assistant Attorneys General*, for appellee.